HENRY H. MEARS and ROBERT W. MEARS, trading under the name and firm of H. H. MEARS & SON v. JOSEPH WAPLES.

A third person in whom property in the goods in question is pleaded in an action of replevin, is not thereby made a party to the suit, and is, therefore, not an incompetent witness for either of the parties in it : but if his interest in the result of it, is equally balanced between them, or preponderates in favor of the plaintiff, he is a competent witness for the defendant.

The known and received usage of a particular trade, and the established course of commercial dealings under it, are tacitly annexed to the terms and become part of a commercial contract. And yet, even a number of banks, or commercial firms or houses in a large commercial city cannot by their practice establish a commercial usage, so as to make it binding on the trading community generally. The established custom or usage of a trade, is undoubtedly the law of the trade. But to make it binding, it must be certain, uniform, reasonable and general, and of long standing, or, at least, of such long standing as to have become generally known, recognized and acted on by the trade, so as to raise a fair presumption that the parties in entering into their engagements did so with a silent reference to the usage, and a tacit agreement that their rights and responsibilities should be determined by it.

The States of the Union in this regard, stand in the relation of foreign states to each other ; so that a custom or usage in one State or city, is not necessarily binding or obligatory upon persons engaged in the same trade in another State or city. And in the absence of affirmative proof that a commercial usage exists among merchants engaged in the corn trade in the City of Baltimore or State of Maryland, that a bill of lading of a cargo of corn bought and shipped in the City of Philadelphia, attached by a pin to a draft for the price of it drawn there at one day's sight on a firm in the former city, is not to be severed or detached from the draft at the time of its presentation and acceptance, and retained by the acceptor, but is to continue and remain attached to it until the maturity and payment of the draft, as security for the payment of it at maturity, the jury cannot presume the existence of such a usage of the trade in the latter city. And in the absence of proof of instructions from the drawers to the bank in Philadelphia, and from the latter to the bank in Baltimore, through which the draft with the bill of lading so attached was transmitted for acceptance and collection, not to allow the bill of lading to be detached from it until the payment of it, the jury will not be justified in assuming that any instructions on the subject had ever been given.

A contract which has been incepted in fraud, is so vitiated by it that it may be rescinded and avoided at the option of the injured party ; and if it be a contract of sale, the seller may reclaim the goods, provided the rights

of a third party, as a *bona fide* purchaser, have not intervened. But the right of the seller to rescind or avoid the contract, and reclaim the goods from the buyer on the ground of fraud, exists only so long as the goods are in the hands of the fraudulent purchaser, or some one who has taken them of him with knowledge of the fraud by which they were obtained by him. It, therefore, follows that a purchaser for a valuable consideration without notice or knowledge of the fraud, takes a valid title from such fraudulent buyer, which cannot be defeated by the original vendor ; and a consignee of goods who in good faith makes advances upon them, stands in the same position as a purchaser for value as against the original vendor, and the same principles of law in this regard apply to his case. After delivery of the goods in pursuance of a sale, the seller cannot rescind the contract and reclaim them on the ground of fraud, without proving deceptive assertions or false representations fraudulently made to induce him to part with them. Mere insolvency of the buyer, though well known to himself and concealed from the seller, does not in itself furnish sufficient ground for rescinding a sale. Nor will the fraudulent purchasing and obtaining goods with an intention of never paying for them, of itself, render the contract of sale absolutely void, even as between the seller and buyer, although it will render it voidable at the option of the seller ; but if they are sold by such fraudulent buyer to an innocent third party for value, the latter will take and hold them by a valid title.

A bill of lading by the custom of merchants, and according to the principles of the common law, is held to be, in a certain sense, a negotiable instrument, that is, an instrument transferable by indorsement. And the indorsee of it who holds it for value, or who has in good faith made advances on the receipt of it, has as good and effectual a title to the goods referred to in it, as he could have obtained by the actual manual delivery to him of the goods themselves. In other words, the indorsement and delivery of the bill of lading is equivalent to a delivery of the goods. So that according to the principles of commercial law, the indorsement of a bill of lading for a valuable consideration, without notice of fraud, or of any adverse interest, vests in the indorsee an indefeasible title, and makes him the absolute owner of the goods against all the world. No amount of fraud on the part of the person who indorsed the bill of lading to him can affect the title of the indorsee to the goods, because his title is that of an honest purchaser without knowledge or notice of any defect in the indorser's title, or any sufficient reason to believe or suspect that fraud has been committed in the original purchase. Nor will the right of such a *bona fide* indorsee be altered or prejudiced by the fact that the person from whom he purchased the goods, had effected the contract with the first seller, or obtained possession of the goods, by means of false and fraudulent representations. And as regards sales for cash and sales on condition, the law is the same in the case of a *bona fide* purchaser without notice or knowledge of the condition, as where the possession of the goods have been obtained by fraud, without his knowledge.

If a party ships a cargo of corn on board of a vessel in pursuance of a contract of sale with, and upon account of, another, and knowingly takes from the captain of her, bills of lading in the name of such other person as shipper and owner thereof, containing an engagement of the captain to deliver the cargo at a certain port named therein " to order " or " assigns," and draws on such other person a draft at one day's sight for the price of it, then it will amount to a delivery of such corn to the latter, and will vest in him a title to the same, and enable him to pass or transfer the property in it to a *bona fide* purchaser.

The burden of proving that an indorsee for value of a bill of lading knew of the fraud by which the purchaser and shipper of the cargo and indorser of the bill of lading obtained the possession of it and of the cargo, rests on the original seller of it seeking to avoid the contract of sale with him, and to reclaim the cargo on the ground of such fraud.

THIS was an action of replevin by H. H. Mears & Son, the plaintiffs, against Waples, the defendant, who was the master of the schooner, Paugussett, for a cargo of indian corn on board of her, and which was lying in the river at New Castle bound with it from Philadelphia to Boston, when the writ was served upon him ; and in which the pleas were 1st, *Non cepet in modo et forma*. 2nd, Property in himself. 3rd, Property in the firm of M. Hunt & Co. in the City of Baltimore. 4th, Property in the firm of Thomas D. Quincey & Co. in the City of Boston, and 5th, Property in a stranger.

The evidence was that the firm of M. Hunt & Co. of Baltimore, had in the course of three or four years preceding the origin of the suit, purchased of the firm of H. H. Mears & Son of Philadephia, the plaintiffs, several cargoes of indian corn amounting in the aggregate to over one hundred and fifty thousand dollars in value. The former firm was, during that period, largely engaged in the business of buying and shipping corn for sale to Boston and and other Eastern ports, while the latter was principally engaged in the business of selling grain on commissions in the City of Philadelphia. The last cargo of corn before the one in question, consisting of six thousand eight hundred and forty bushels, was bought by the former of the latter firm on the 14th day of January 1867, and which was paid

for by a draft at one day after sight drawn by the latter upon the former firm. In the latter part of February following, both in a personal interview with the plaintiffs, and soon afterward by letter, Montgomery Hunt of the former firm applied to them to purchase a cargo of ten to twelve thousand bushels in Philadelphia for his firm, representing to them that he had frequent orders for corn from the eastward, and often more than he could fill in Baltimore, and that he would furnish to such persons in the east the names and address of the plaintiffs, so that their orders could be sent direct to them on such occasions as he should be unable to fill them in Baltimore, and that the cargo he was then contracting for, he was buying upon such an order; and particularly requesting of them that when purchased it should be shipped by them to the order of his firm, the same to be paid for as soon as shipped, by draft of the plaintiffs on his firm at one day's sight with bill of lading attached. The plaintiffs agreed to procure and furnish the cargo on the terms proposed, and accordingly shipped on board of the schooner mentioned and of which the defendant was then master, $11,451\frac{32}{56}$ bushels of corn at the port of Philadelphia, per account of M. Hunt & Co., and received during the time they were loading her, a letter from that firm dated March 1st 1867, instructing them to have her loaded by the Monday following, if the weather continued good, and to make the bill of lading the same as Waples', to order, and that they would name the point of destination by telegraph the next day; to draw on them when loaded, at one day's sight with bill of lading attached, and to try and get exchange as light as possible; and also another letter dated the 4th of that month, informing them that the schooner Paugussett would sail for Boston and report to No. 40, Commercial Street. On the 6th of that month, the plaintiffs had prepared by their clerk in their counting house, three bills of lading for the cargo, and had them duly signed by the defendant as master of the schooner, two of which they retained, leaving the third in his hands, in the following

form: " Shipped in good order and condition by M. Hunt & Co. in and upon the Schooner called the Paugussett, whereof Joseph Waples is master for the present voyage, now lying in the port of Philadelphia, and bound to Boston, Mass., Eleven thousand four hundred and fifty-one $\frac{32}{56}$ bushels corn to be delivered being marked and numbered in the margin ; to be delivered in like good order and condition at the aforesaid Port of Boston, Mass., (the dangers of the seas only excepted) unto order, or assigns, he or they paying freight for the said goods at the rate of ten cents per bushel weight without primage and average accustomed." That put in evidence had the following indorsement on the back of it : " To the order of Thos. D. Quincey & Co.," and was introduced to sustain the plea of property in that firm. On the same day the plaintiffs drafted on the firm of M. Hunt & Co. at one day's sight for $11,908.65, the price of the cargo of corn, including the exchange on their draft, and indorsed it with the bill of lading attached to it, to the Philadelphia National Bank, which the bank received from them as cash and placed the amount of it to their credit, and immediately indorsed and forwarded it to the National Union Bank of Baltimore, and the following day it was presented with the bill of lading attached, by the messenger of that bank to Montgomery Hunt at the place of business of his firm in that City for acceptance,when he took it from the messenger, wrote their name and acceptance upon the draft and then detached the bill of lading from it, and retaining it, handed the draft back to him without it. The messenger did not object to his doing it, but had objected on a former occasion a few months before that, to his detaching a bill of lading similarly attached by a pin merely to another draft of the plaintiffs for $10,000, when he presented it to him for acceptance and after he had written his acceptance upon it, to which Mr. Hunt then replied that on their acceptance they always kept the bill of lading, and as the bank, up to the occasion when the bill of lading in question was so severed, had never given him any instructions on the sub-

ject, he made no objection to his doing so at that time. The bank, however, had since directed him not to allow it to be done again in any instance until the drafts had been paid, and he had not allowed it to be done since in any case.

On the same day on which M. Hunt & Co. accepted the draft of the plaintiffs, they drew on the firm of Thomas D. Quincey & Co. of Boston, a sight draft to the order of the Bank of Commerce of Baltimore, for $10,350, and indorsed to the order of that firm and attached to it the same bill of lading which M. Hunt had that day detached from the draft of the plaintiffs and retained in his possession when he accepted it, and delivered it with the bill of lading attached to that bank, which it immediately remitted to the National Exchange Bank of Boston for collection, and which with the bill of lading attached to it was presented in two days thereafter to Thomas D. Quincey & Co. in Boston, and was paid by them, and the draft and bill of lading were thereupon delivered to them. In two days afterward the firm of M. Hunt & Co. failed, and the draft of the plaintiffs upon them was protested for non-payment and was returned to the Philadelphia National Bank, where it had since remained without any payment upon it ; and upon the next day, the 12th of March, the firm of M. Hunt & Co. executed a deed of assignment of all their property in copartnership and individual, in trust for the benefit of their creditors.

The loading of the schooner had been completed by the plaintiffs on the 6th and had sailed for Boston on the 7th of March, and when they learnt on the 11th of the month, of the protest of their draft and the failure of M. Hunt & Co., they determined to stop the cargo in *transitu* and before it could be delivered in Boston if possible, and despatched an agent to that city for the purpose ; but before his return they ascertained that she had been arrested by the ice in the river and was lying at New Castle, when a peremptory order was given by them to the defendant to proceed no further with the cargo, and afterward efforts

were made by them to induce him to recognize their right to reclaim the possession of it without avail until the 19th of the month, when a formal and written demand was served on him by the plaintiffs for it, and when, the defendant still refusing to comply with their demands, this action was instituted.

On the trial the testimony of several bank officers and mercantile gentlemen engaged in the grain trade in Philadelphia, was introduced on behalf of the plaintiffs who proved their understanding of the usage and custom in such cases to be, that the acceptor of a draft has not a right to detach a bill of lading from it until it is paid, and that it is considered when so attached, to be a security for the payment of the draft at maturity, and so much a part of it up to that time, that it ought not to be detached from the draft until it is paid. Also that a sale of goods to be paid for by draft at ten days after sight or less, is equivalent to a sale for cash. Whilst on the other hand, the testimony of several other gentlemen engaged in the same business, and from the same city, was introduced by the defendant who proved their understanding in such case to be, that the only object of attaching a bill of lading to a draft was to satisfy the drawee that the goods upon the credit of which it was drawn, were on their way to him, and that he would be safe in accepting and paying it at sight, or at maturity, and they knew of no usage or custom of trade that would make it wrong or improper for the acceptor of such a draft to detach the bill of sale from it when he accepted it and before it was paid.

Montgomery Hunt of the firm of M. Hunt & Co. was called as a witness on behalf of the defendant, and being sworn and examined on his *voir dire* at the instance of the plaintiffs, declared that he was a member of the firm up to the time of its failure, but he was not interested in the result of the suit.

*T. F. Bayard*, for the plaintiffs, objected, notwithstanding his declaration that he was not interested in the

result of the suit, to his competency as a witness for the defendant, because as a member of that late firm, he would be liable to the firm of Thomas D. Quincey & Co. for the amount of their draft upon that house for the $10,350, which it had accepted and paid, in case it failed to establish a good right and title in this action to the cargo in question; and because among the several pleas filed in this case there was one to the effect that the property in the cargo at the time it was seized by the sheriff under the writ of replevin, was in the firm of M. Hunt & Co., of which he was a member before its failure and dissolution.

*Whitely*, (*Comegys* with him, for the defendant). The interest of the witness in the result of the suit was evidently an equal or balanced interest, for the only question involved in it, and to be decided by the court and jury was, whether the cargo of corn in dispute was the property of the plaintiffs, or of the firm of Thos. D. Quincey & Co. for which they were concerned as counsel, when it was seized by the sheriff, and the liability of the witness would in effect be one and the same, whatever might be the result of this action: because if the plaintiffs prevailed, he would be liable to the firm of Thomas D. Quincey & Co., as had been stated on the other side, but if the latter firm prevailed, he would be liable, on the other hand, to the plaintiffs for the amount of their draft on the late firm of which he was a member, and which had been accepted by it, with the difference only, that he would be liable in that event, to the plaintiffs in a larger sum than he would be in the other event, to the house of Thos. D. Quincey & Co. But the plea of property in the late firm of M. Hunt & Co. did not make it in any sense a party to this action, nor were they parties to it in any manner whatever. No judgment could be rendered for or against them in it, not even for cost. 1 *Greenl. Rep.* 376. 8 *How.* 428. 4 *Mass.* 488.

*Gray*, for the plaintiffs, cited 1 *Greenl. Ev. secs.* 329, 391. 2 *Greenl. Ev. sec.* 590.

*By the Court.* This presents the case of a similar interest, if not an equal and balanced interest, on both sides of the suit, with this difference as to the interest of the proposed witness in the result of it, that it preponderates on the side of the party objecting to his competency, his liability to the plaintiffs in the event of their failure to recover in the action, being for the amount of their draft on the late firm of which he was a member and accepted by it, for $11,908.65, and on the other hand his liability to Thomas D. Quincey & Co. in case the plaintiffs succeed in the action, being for the amount of the draft of his late firm on that house and paid by it, for $10,350. It consequently cannot exclude him; nor can the other objection for the reasons stated in the argument. Both objections are therefore overruled.

The witness was then sworn in chief and testified that his firm commenced business in Baltimore in the year 1861, and for two or three years prior to March 1867, did business with H. H. Mears & Son of Philadelphia, and during that time, to the amount of from $150,000 to $200,000. The last cargo of corn they bought of them prior to the cargo involved in the present suit, was 6840 bushels on the 14th of January 1867, and which they paid for by a draft at one day's sight, drawn by them on his firm for the price of it. All their drafts on his firm from 1863 to 1867, were at one to three days after sight. He detached the bill of lading from their draft on his firm of March 6th 1867, and had done the same with all their other drafts before that when his firm accepted them; and it was never objected to either by them, or by the bank. On the same day that he accepted their last draft and detached the bill of lading from it, he drew a draft in the name of his firm to the order of the Bank of Commerce in Baltimore, on the firm of Thomas D. Quincey & Co. of Boston, at sight, for $10,350, and attached the bill of lading to it, and delivered them to the Bank for transmission and collection. That was on the 7th of March 1867, and on the 9th of that month it was paid by that firm. His

firm had been shipping corn during the time before mentioned to Boston, and sometimes to other eastern ports; but it had never before that cargo shipped any to that house, and even then he had no acquaintance with any member of it, but on the recommendation of a commercial gentleman in Baltimore, and upon inquiry of him for a good house in the trade there, concluded to ship that cargo to them, and then wrote to them that he might ship to them, which was not long before the cargo was ready to leave Philadelphia. He also wrote to them to insure the cargo there for $13,000. Corn was worth in that market during the months of March and April in that year, from $1.25 to $1.30 per bushel.

James Barrett of Philadelphia, another witness examined for the defendant, testified that on the 18th of March 1867, he received a letter from the firm of Thomas D. Quincey & Co. inquiring if he knew where the schooner Paugussett then was, and that they had an interest in the corn on board of her, and had advanced $10,000 on it, and that upon the 20th. of the month he called on the plaintiffs and informed them of the facts above stated, and that Mr. Mears replied that it was all right, and that the captain had just left their office to start on the voyage with the corn to that firm, and that he immediately telegraphed to them to that effect.

*Gray*, for the plaintiffs. There was enough disclosed in the facts and circumstances of the case to warrant the position they were about to assume in the trial and argument of it, that M. Hunt & Co. by undue and improper means, fraudulently obtained the bill of lading for the cargo of corn in question from the plaintiffs, and thereby fraudulently obtained possession of the property of the plaintiffs in it, without paying for it according to the contract between them, in full view and anticipation of their speedy and inevitable failure which occurred in four days thereafter. When the possession of property is obtained under a fraudulent contract of sale, it is voidable and revocable

at the option of the vendor, as soon as the fraud is discovered by him. And the next proposition we have to submit is, that no one can pass to another a better title than he himself has in goods, and therefore the voidable and revocable nature of such a title which has passed from the original vendor to the vendee, follows and abides with it every where, except where it has passed to an innocent purchaser without notice of the fraud; and any one so claiming the property, must bring himself within this exception to the general rule which he had just stated. But where a person fraudulently or erroneously obtains possession of property outside of the terms of the proposed contract of sale, and without the knowledge of the owner, he can confer no title to it upon another, however innocent such purchaser may be, except where the owner of it has voluntarily armed the wrong doer with the symbol of property, so as to enable the latter to perpetrate a fraud on such purchaser.

We have proved enough to satisfy the jury that M. Hunt & Co. in this case, were guilty of a premeditated design to get this cargo of corn into their possession, and to sell it without paying the plaintiffs a cent for it, and the moment the plaintiffs discovered that design to defraud them in the transaction, and took steps to avoid and defeat it, all the title of M. Hunt & Co. to the cargo instantly ceased, and they could confer no title to it upon even an innocent purchaser without notice or knowledge of the fraudulent means by which they had acquired it. Because, in such a case he takes a tainted title, and that taint remains and inheres in it. *Hil. on Sales* 332, 334. We have shown that that firm obtained the possession of the corn under a contract to pay for it in cash, but with the intention not to pay for it as contracted for, or to pay for it at all; and the sale was, therefore, void, and passed no right or title whatever in it to them. *Earl of Bristol v. Willsmore* 8 *E. C. L. R.* 218. *Irving et al. v. Motley et al.* 20 *E. C. L. R.* 244. Since the time of these decisions, the cases had multiplied and have shed much light upon the question.

If a vendee obtains goods under a contract to pay for them on delivery, and on the delivery of them gives a check without having the funds to meet, or a reasonable prospect of being able to meet it, he takes no title to the goods. *Hawes v. Crowe*, 21 *E. C. L. R.* 784. If a purchaser obtains possession of goods with the fraudulent intention of never paying for them, he acquires no property in them. The contract is void, and not merely voidable. *Load v. Green*, 15 *M. & W.* 216. *Ch. on Contr.* 321. And any purchaser of them from such a vendee, must affirmatively show that he is an innocent purchaser, and that he had no reason whatever to suspect the tainted and fraudulent title of such vendee in them. *Caveat emptor* is the emphatic and inflexible maxim which applies with all its force in such cases. *Gill v. Cubitt*, 3 *Barn. & Cress.* 466. *Miller v. Race*, 1 *Smith's Ld. Ca.* 752. And such a purchaser is bound to inquire and to show that he had no ground to suspect the validity of such a vendee's title to them. *Copeland v. Bosquet*, 4 *Wash.* 594. When the owner of personal property has not conferred upon the vendor of it the apparent right of property in it, or right of disposal of it, a purchaser of it is not protected against the claims of the owner of it, though such purchaser acquires the property for a fair and valuable consideration in the usual course of trade, without notice of any conflicting claim or of suspicious circumstances calculated to awaken inquiry, or put him on his guard; and it was accordingly held that the purchaser of a part of the cargo of a vessel, was not protected against the claims of the real owner, although the purchase was made under a bill of lading regular and fair on its face, it appearing on the trial of the cause that the master of the vessel in which the goods were originally shipped, had fraudulently, at an intermediate port, transshipped them into another vessel and procured a bill of lading in his own name which he transferred to his agents, the vendors of them. *Saltus v. Everett*, 20 *Wend.* 267. *Mowry v. Walsh*, 8 *Cow.* 243. *Root v. French*, 13 *Wend.* 572. In the case now before the court, the symbolical possession

of the property or cargo of corn consisted of the bill of lading, and M. Hunt & Co. obtained the possession of it without the consent, and contrary to the intention and expectation of the plaintiffs, and, of course, contrary to the contract of sale between them; and in such a case, even an innocent purchaser of the goods for a *bona fide* consideration without any notice or knowledge of the way in which the holder of the bill of lading got possession of it, gains no title to them against the real owner of them. For it has been ruled in a recent case in the Court of Queen's Bench, that the *bona fide* transferee for value of an indorsed bill of lading from another, was not entitled to the cargo, unless the latter had, not merely possession of the bill of lading, but a right to transfer it, inasmuch as bills of lading are not negotiable to the same extent as bills of exchange. *Gurney v. Behrend*, 77 *E. C. L. R.* 622.

A fraudulent purchaser acquires no title as against the vendor; but where a vendor delivers possession of his goods with the intent, not only that the possession, but that the property in them shall pass, a *bona fide* purchaser from a fraudulent vendee will hold them in preference to the original owner; and in questions of fraudulent purchase of goods where there is a manual tradition of them, or an actual delivery of them to the vendee, the point submitted to the jury should be, whether the vendor in parting with the possession of them, intended also to transfer his interest in the thing sold. *Andrew v. Dieterich*, 14 *Wend.* 31. In the sale of personal property where any thing remains to be done before the sale can be considered as complete, whether to be done by the vendee, or by the vendor, as between the parties themselves the right of property does not pass, although the property itself is placed in the possession of the vendee. *Ward v. Shaw*, 7 *Wend.* 404. And a fraudulent holder of a bill of lading, (and he is such who is to pay for the goods on the receipt of it, or within one day thereafter, but immediately transfers it with the goods by endorsement, without ever paying a cent for them) can pass no title to the goods by an

75

indorsement of it to an innocent purchaser without notice of the fraud. *Decan v. Shipper*, 11 *Casey* 239. It is also fraudulent for a person to purchase goods and take possession of them when he knows of his own insolvency, and has no reasonable prospect of paying, even when there is no other evidence of a fraudulent design on his part exhibited in the transaction. *Rowley v. Bigelow*, 12 *Pick.* 306. The rule in this respect is the same with reference to a bill of lading, as it is with reference to the property to which it relates, for it passes the property on a *bona fide* indorsement and delivery when it is so intended to operate, in the same manner as a direct delivery of the goods themselves would do, if so intended; but it can operate no further. For the symbol can not have a greater operation to enable the holder of it to defraud another, than the actual possession of the goods themselves which it represents could have. *Newson v. Thorton*, 6 *East* 17. And if M. Hunt & Co. had no valid title to the cargo when they indorsed the bill of lading in this case to Thomas D. Quincey & Co., the latter could have acquired none to the cargo, for the vendee of chattels cannot acquire a title to goods, if the vendor of them to him has none to transfer, even when the sale is made or confirmed by a bill of lading, or other instrument of the same nature, symbolizing and describing the property sold. If a bill of lading is placed in the hands of a purchaser or agent under circumstances which justify the belief that he is authorized to transfer it for value, or to deal with it as his own, it may operate as an estoppel in favor of all who give value for it on the faith of the appearance of authority or title thus created by it, and precludes the assertion of rights that would otherwise have been valid. But when the possession of an instrument of that kind is due to fraud or felony, it will confer no right or title as against the true owner, and the defect will not be removed by a subsequent negotiation of it in good faith.

The right of stoppage *in transitu* will not be defeated by the indorsement of a bill of lading by an agent in violation of the instructions of his principal. 1 *Smith's Ld.*

*Ca.* 1087. And in any and every case in which the possession of such an instrument has been obtained by fraud, or with the preconceived intention of defrauding or cheating the true and rightful owner out of the goods, and is indorsed by such a vendor or holder of it to, even, an innocent purchaser of the goods for a valuable consideration on the faith of the bill of lading, it is incumbent upon such purchaser to prove that he bought them without notice or suspicion of the manner in which the party of whom he bought them, had acquired or purchased them. *Copeland v. Bosquet,* 4 *Wash.* 588. A bill of lading is not a negotiable paper in the proper sense and legal signification of the term, for it does not represent money, or a debt due from one person, or a promise, or engagement to pay money to one person, or to a number of persons upon the order of another, nor does it possess any general currency or circulation as such, and was never designed or supposed to partake of the peculiar character and credit of a bill of exchange or promissory note, or to serve the great and important purposes for which they were introduced into commercial usage ; because it possesses after all, but one faint feature of resemblance or analogy to them, and that is simply, that by commercial usage and the indulgence of the law, it is, like them transferable by indorsement merely, and as a symbol of the goods and chattels referred to in it, when so indorsed and delivered to a purchaser of them for a fair consideration and without any taint of fraud or illegality in the transaction, it will be considered to be a symbolic transfer of the goods themselves, and equivalent in law to an actual delivery of them to such purchaser. But there its office ends, for no action of law lies upon it *per se*, either against the maker, receiver, or indorser of it. The case of *Lickbarrow v. Mason* has probably done as much as any other, to sanction a contrary doctrine on this point, and may be cited on the other side ; but it is not to be viewed or considered as giving bills of lading the character of negotiable instruments, which was wholly unnecessary for the purposes of the decision in that case. Noth-

ing in fact, could be a greater departure from the principles and analogies of the common law, than to treat bills of lading or other documentary evidences of title to chattels personal, as negotiable instruments; for chattels personal are wholly insusceptible of negotiation in themselves, and it is manifestly inconsistent to give the instruments which represent them a different character. 1 *Smith's Ld. Ca.* 1088.

The plaintiffs had proved that by the original contract between them and M. Hunt & Co., the cargo of corn was to be paid for in cash on the delivery of it to his firm, but afterward at his special request, it was agreed between them that it should be paid for by a draft drawn by them on his firm payable one day after sight, and his detaching the bill of lading from it and indorsing and transmitting it to the firm of Thomas D. Quincey & Co. the same day it was presented to him and the day before it was payable, and without paying it, or having any funds to meet the payment of it on the following day, and which he then well knew was bound to go to protest the next day for that reason, was not only in direct violation of his contract of purchase, but it was also strong and conclusive evidence of a deliberate and premeditated design on his part, to get possession of the corn and to sell and transfer the property in it to another without ever paying for it, and thus to defraud the plaintiffs out of the price of it entirely. Such a contract for the purchase of it to be paid for by draft at one day's sight, was according to the usages of trade equivalent to a cash sale, or to a sale to be paid for on delivery of the cargo and the bill of lading, and the true meaning and intention of the contract in such a case was, that the bill of lading for it attached to the draft should remain attached to it, as a safeguard and security for the payment of it, until it was duly paid the next day according to the tenor of it; and it was, therefore, not to be considered an actual delivery of either the cargo, or the bill of lading which was but the legal symbol of it, no more than it was to be considered an actual delivery of the draft itself to

which it was attached, before the payment of it, or when it was presented to him for acceptance merely. And as there was no proof whatever in the case that the failure of M. Hunt & Co. was at all unforeseen or unexpected by them when it occurred, which was only four or five days afterward, the inference and conclusion was irresistible that it was the design of M. Hunt & Co., in anticipation of their speedy failure, to obtain in that fraudulent and surreptitious manner the possession of the bill of lading and of the cargo of corn which it symbolized and by a fiction of law represented, and by indorsing it to Thomas D. Quincey & Co. and attaching it to the draft drawn by him on that house at sight, and lodging it the same day in bank in Baltimore, to realize, at least, $10,350 out of it, before their failure, and on the very eve of it, and which he doubtless then foresaw and well knew was inevitably and rapidly approaching, and which, as he had before said, constituted not only a gross and outrageous breach of the contract of sale itself, but a deliberate and preconcerted fraud upon the plaintiffs, which upon the authority of the numerous cases he had before cited on that point, would utterly extinguish and annihilate any legal right or title which he or they could claim to have acquired by such dishonest means in the property.

*Whitely*, for the defendant. This is an action of replevin against the defendant, the captain of the vessel, who came into possession of the cargo in question, by no tortious or wrongful act, but lawfully, and the first objection he had to make to the plaintiffs' right to recover in it, was that there had been no demand made by them upon the defendant for the delivery of the corn to them before the institution of the suit against him for it. For what had been proved and put in evidence as their written demand served upon him on the 19th of March 1867, was not a demand for a delivery of the corn to them, but that he should hold, or in other words, retain the possession of it for them until such time as is indicated in it, and which

was until they could have a reasonable opportunity of testing the question of their legal ownership of it.  Besides, as the master of the schooner and the representative and agent of the owners of her, and as a common carrier of goods for hire, he had a specific lien on the cargo for the freight due the vessel upon it, and a legal right to hold and retain it in his possession, until the freight was paid or tendered to him, and which the proof also showed had not been done until after the commencement of the action. He should at the same time contend on the testimony of Mr. Barrett which had not been contradicted or denied, that the declaration made by Mr. H. H. Mears in his store in Philadelphia to him on the 20th of March, the day after the written demand of the plaintiffs had been served upon the defendant, when Mr. Barrett called there to ascertain where the schooner then was, that the captain had just before that left his store to go on board of her, that it was all right and that he might write to Mr. Quincey that she was then on her voyage to Boston, amounted by way of admission to a waiver of their previous demand, such as it was, upon the defendant in regard to holding the cargo for them.

There was, however, not only a complete delivery of the possession of the corn by the plaintiffs to M. Hunt & Co. at the port of Philadelphia, but a complete transfer of the property in it by them to the latter, as soon as the cargo was shipped and the bills of lading for it were signed and delivered by them in the name of M. Hunt & Co. In execution of the contract of charter the master of a ship signs the bill or bills of lading which is an acknowledgment of the receipt of the goods on board of the ship, and of the obligation to carry them which he assumes.  It contains the quantity and marks of the merchandise, the names of the shipper and consignee, the places of departure and discharge, and the name of the master and of the ship with the price of the freight therefor.  The charter party is the contract for the hire of the ship, and the bill of lading for the conveyance of

the cargo; and though it is signed by the master or captain, he does it as agent for the owners of the ship, and it is a contract binding upon them.   By it the master engages as a common carrier to carry and deliver the goods to the consignee, or his order, dangers of the sea excepted; and by the common law, the owners of the ship were responsible for damages to the goods on board to the full extent of the loss.   There are commonly three bills of lading prepared and made out, one for the shipper or freighter, another for the consigee or factor, and a third is usually kept by the master of the ship for his own use and instruction.   And it constitutes the document and title of the goods shipped; and, as such, if it be to order or assigns, it is transferable in the market.   The indorsement and delivery of it transfers the property in the goods from the time of the delivery; and the *bona fide* holder of the bill of lading, indorsed by the consignee, is entitled to the goods, if he purchased the bill for a valuable consideration.   3 *Kent's Com.* 206,207.   In one aspect of the case, the firm of Thomas D. Quincey & Co. were the second purchasers or vendees of the cargo of corn in question, although they were the first persons to whom it was consigned by the bills of lading after it was shipped in Philadelphia, the plaintiffs having purchased it for, and sold it to, the firm of M. Hunt & Co. in the city of Baltimore and shipped it in the name and to the order of the latter to the former firm in Boston; and it has been ruled that the second vendee of goods *in transitu* cannot, unless he be the indorsee and holder of the bill of lading for them, or unless the original vendor has made himself a party to the resale of them by clothing the first purchaser of them with documentary evidence of title to them, stand in a better situation with reference to them, than the first purchaser, his immediate vendor. If, therefore, goods are sold and delivered to a carrier to to be forwarded to the purchaser, and the latter resells them *in transitu* and receives the price and then becomes insolvent, the first vendor may stop the goods at any

time before they have come into the possession of such
second purchaser, and hold them as a security for the
due payment of the original purchase money.   The right
of property in the goods may be thereby transferred to
the second purchaser, but he has no right to the posses-
sion of them, any more or better than his immediate ven-
dor had.   If however, in such a case, the second pur-
chaser claims the goods as the *bona fide* indorsee and hold-
er of a bill of lading of them, the law is entirly differ-
ent, and both his property in and legal title to the
goods will be complete and absolute.   Because what is
called a bill of lading, is by the custom of merchants
recognized and sanctioned by the common law, a negoti-
ble instrument, and the indorsement and delivery of it to
third parties, who have given credit to such bill of lad-
ing, and have bought the goods mentioned in it in igno-
rance of the state of accounts between the shipper and
his immediate purchaser, transfers the property to the in-
dorsee as absolutely and effectually as if the goods them-
selves had been manually delivered to him.   As between
the consignor or first vendor and his immediate vendee,
the indorsement or delivery of the bill does not destroy
the right of stoppage *in transitu*, or deprive the unpaid
vendor of his right to recover and retain possession of
the goods.   Its existence does in no degree alter or vary
the rights and respective situations of the immediate par-
ties to the sale.   As between the shipper and master of
the vessel, it fixes and determines the duty of the latter
as to the persons to whom the goods are to be delivered,
but it may be revoked and countermanded in case of the
insolvency of the consignee, at any time before it has
been actually executed and obeyed by the delivery of the
goods themselves, like any other order or direction given
to a common carrier.   But as between the consignor or
first vendor and third parties who are *bona fide* purchasers
for a valuable consideration, the case is widely different.
The first vendor by indorsing and delivering the instru-
ment to his immediate purchaser, accredits the title of

the latter to the goods, and holds him out to the mercantile world as the owner of them, and the *bona fide* indorsement and delivery of such purchaser to a third party consequently deprives the first vendor of all power and control over the goods, and destroys his right to stop them *in transitu* as against such *bona fide* holder of the bill of lading for value. If, however, the assignee of the bill is not a purchaser of the goods, and has given no value or consideration for the indorsement of the bill of lading, or if he knew of the insolvency of the consignee at the time he took it, even though he pays full value for the goods, he will be in no better situation than the consignee, his immediate vendor. *Add. on Contr.* 260,262. The rule which has often been recognized, that where the purchaser is insolvent, and knows himself to be so, and has no reasonable expectation of being able to pay for the goods, or fraudulently misrepresents his ability to pay for them, he acquires no title to them as against the vendor, is held equally applicable to a *bona fide* creditor of the purchaser, whose claim had accrued before the sale, and who, therefore, could not have trusted him upon the credit of the goods, claiming under a legal process against the purchaser. But a sale of this description is only voidable, and not void. And hence it is the prevailing doctrine that one who purchases *bona fide* from the first vendee, before the vendor elects to avoid the sale, (or, it seems, an attaching creditor whose claim had accrued after the sale) will in such a case hold the goods against the vendor. And what is meant by a purchaser in these cases, is one who obtains the goods, or the bill of lading from the vendee in the usual course of trade without notice; or in other words, one who gives value for them, by making advances, or incurring liabilities, or taking them in pledge for money loaned on their security. But not one who receives them in payment of, or as security for, a pre-existing debt. The mere possession by the vendee carries with it no right or authority to transfer the title. That continues in the vendor until the conditions of sale

and delivery are complied with by the vendee, or are waived by the vendor. And this constitutes the precise distinction between a sale and delivery of goods on condition, and a sale procured by fraud, or false representations on the part of the vendee. In the latter case, the property in the goods passes by the sale and delivery, because such was the intention and agreement of both the parties at the time of the sale and delivery of them. And, therefore, in such a case the vendee having the property in the goods, as well as the possession of them, can pass a good title to the purchaser who takes them in good faith and without notice of the fraud. But the vendor can reclaim the goods by rescinding the contract and avoiding the sale, so long as they remain in the possession of the vendee, or of any one who has taken them with notice of the fraud, or without paying a valuable consideration for them. In such case, the title to the goods is in the vendee, though defeasible at the option of the vendor, because the vendee, or any one claiming under him with knowledge of the fraud, cannot honestly and legally hold the property against him. But in the case of a conditional sale and delivery, the title does not pass from the vendor until the condition is fulfilled. And any one who in good faith buys goods, or advances money, or incurs legal liability in the ordinary course of business on the faith and credit of the title of a fraudulent purchaser, is in law a *bona fide* purchaser of them. *Hil. on Sales*, 322,333. *Caldwell v. Bartlett*, 3 *Duer* 341. *Hoffman v. Noble*, 6 *Metc.* 68. *Root v. French*, 13 *Wend.* 570. *Hall v. Hinks*, 21 *Maryland* 406. *Dows v. Greene*, 16 *Barb.* 72. *Gilbert v. Hudson*, 4 *Greenl.* 345. *Durell v. Haley*, 1 *Paige* 492. *Rowley v. Bigelow*, 12 *Pick.* 306. *Walter v. Ross*, 2 *Wash.* 283. *Conrad v. Atl. Ins. Co.* 1 *Pet.* 445. *Lickbarrow v. Mason*, 6 *East.* 19. 2 *Smith's Ld. Ca.* 388, 445. *Wright v. Campbell*, 4 *Burr.* 2046. *Noble v. Adams*, 7 *Taunt.* 59. *Tindall v. Ellison*, 4 *Ell. & Black.* 220. *Caldwell v. Baugh*, 1 *T. R.* 205. *Stewby v. Hayward*, 2 *H. Black.* 504. But as this alleged fraudulent purchase by M. Hunt & Co. occurred in Maryland,

we have a leading and well considered case decided by the courts in that State, and not unlike the present in the statement of the facts and circumstances of it, to this effect, that it does not follow that a sale is fraudulent and void because the vendees at the time of the purchase are insolvent, and knew themselves to be so, and did not communicate that circumstance to the vendors, who were ignorant, and were known to be ignorant thereof by the vendees. *Powell & Fiddeman v. Bradlee & Co.* 9 *Gill & Johns.* 220. If a commission merchant in the usual course of business, makes advances to the owner of merchandise stored in a distant city, and receives from such owner as security, the warehouse certificates for it and an order thereon to deliver the property to himself, the legal title passes to him as security for his advances, and the goods cannot be attached and taken possession of as the property of the former owner, who has only an equitable in-interest therein, though neither the warehouseman nor the attaching creditor had notice of such transfer. *Gibson v. Stevens*, 8 *How.* 384. If a consignor takes from the carrier an obligation to deliver the goods to A. for the use of B. the purpose being to secure a debt due from the consignor to B. the assent of the latter will be presumed, and the property passes at once to B. and cannot be attached for a debt of the consignor. *Grove v. Brien*, 8 *How.* 429.

The bill of lading in this case was delivered to the firm of M. Hunt & Co. in the regular and usual course of their trade and business in the City of Baltimore, and there was nothing wrong, improper or unusual in their detaching or unpinning it from the draft and retaining it when they accepted the latter. There was no such commercial usage or custom existing there to the contrary, as had been alleged and contended for on the other side, to forbid or preclude the propriety and legality of it. But even if it had been unusual, or irregular, or contrary to an established usage of trade in such a case, the delivery of the bill of lading to them was the act of the bank there, which allowed it to be detached and retained by them without any objection,

and thereby tacitly sanctioned it, at least, and which was a conclusive answer to the allegation and a complete refutation of the pretext or pretension that they obtained the possession of it, either tortiously, or fraudulently, or even improperly. If that bank, or the bank in Philadelphia through which the draft with the bill of lading attached was transmitted for their acceptance and collection at maturity, were not the true and legal owners, as well as holders of it, at the time when it was presented to them for acceptance, as it had already been cashed at the bank in Philadelphia and the amount of it had been entered upon its books to the credit of the plaintiffs, they were, at least, the agents directly of the plaintiffs in the transaction, and consequently their act as such in the premises was the act of their principals, and their delivery of the bill of lading to them under the circumstances, was the delivery of their principals, and was, in effect, the act of the plaintiffs themselves in the matter. And if the firm of M. Hunt & Co. were in the rightful possession of it, or were guilty of no fraud in obtaining the possession of it, their approaching failure, or actual insolvency at the time, even if it were then well known to them, could not have vitiated or invalidated their immediate indorsement and transmission of it to Thomas D. Quincey & Co. or in any manner impaired or affected the legal title of that firm to it, and to the cargo of corn of which it was the symbol, by virtue of the indorsement and delivery of it to them, and their acceptance at sight at the same time and payment of the accompanying draft of the firm of M. Hunt & Co. on account of it, for $10,350. But, even, if M. Hunt & Co. had been guilty of the grossest fraud both in law and fact, in obtaining the possession of the bill of lading in question, it still could not affect in the least, the title of Thomas D. Quincey & Co. to the cargo, unless the jury were satisfied that they had notice or knowledge of such fraud at the time when they received it and the draft accompanying it, and accepted and paid it; but of which it was scarcely necessary to add there was not one particle of evidence before them. Indeed,.

the evidence was so strong and conclusive to the contrary,. that it was impossible for any reasonable person to entertain even a suspicion of it. *Hil. on Sales.* 306. *Cross v. Peters,* 1 *Greenl.* 376.

*Comegys,* on the same side. The counsel for the plaintiffs seems to contend that they did not intend in this case to pass any title in the corn to M. Hunt & Co.,the shippers of it, until their draft for the price of it had been paid by them, for there was no pretension that it was *in transitu* from the plaintiffs to that firm; or if not, that it was but a conditional sale of it by the former to the latter, under the facts and circumstances proved in the case. But the contract of sale was made in the State of Pennsylvania, and in this respect must be governed by the *lex loci;* but by the law and the judicial decisions in that State, there can be no conditional sale, or a sale upon a secret condition, or a secret trust, for when a sale made there upon a secret trust or condition that no title is to pass to the party to whom the article is delivered until it is paid for, the trust or condition is void. *Story's Conf. of Laws,* secs. 242, 267. *Story on Sales,* sec. 313. *Martin v. Mathiot,* 14 *S. & R.* 214. *Story on Sales,* sec. 246. *Pars. on Notes & Bills* 328. *Stanton v. Eager,* 16 *Pick.* 467. *Cox v. Hurdon,* 4 *East* 211. *Add. on Contr.* 853. When the plaintiffs put that firm in possession of the cargo, as they did by shipping it in their name or to their order, they knew or must be presumed to have known that by the laws of that State they clothed them with the evidence of the title to it, and thus enabled them to deal with others in regard to it on the faith and credit of their being the rightful and lawful owners of it; and for that reason such a condition in the contract of sale, was in contemplation of law, fraudulent and void in that State. But there was in this case an absolute delivery of the cargo on board in Philadelphia by the plaintiffs to that firm, and there was therefore no right of stoppage *in transitu* applicable to it. *Story on Sales,* sec. 336. *Stubbs v. Lund,* 7 *Mass.* 474.

What is the effect of a sale of goods to be paid for, as in this case, by a draft at one day's sight? It is not strictly or literally a sale to be paid for in cash on delivery of the goods, although merchants may ordinarily regard it in their business transactions, as practically tantamount to it; but with the days of grace added to the day after presentation and acceptance of the draft, it was actually equivalent to a sale and delivery of the cargo on a credit of four days, at least, and no action would lie for the price of it until after the four days had expired. The order in the letter of M. Hunt & Co. to the plaintiffs, was to draw on them for the price of the cargo when shipped in their name and to their order at one day's sight with bill of lading attached, which was done by them, and this, he contended and asked the court to charge the jury, was a contract of sale of the cargo by the plaintiffs to them, on credit, or on time, and was not a sale of  for cash to be paid for on delivery. The plaintiffs had no right to retain the bill of lading with the draft after the latter had duly indorsed their acceptance upon it, because the cargo was not to be delivered to them in Baltimore, but upon the face of it, to their order at No. 40, Commerce Street in the City of Boston, and was shipped in their name, as the purchasers of it, in the City of Philadelphia to that destination. And how could any one say that was not a delivery of it to them from that moment, or was not a sale and delivery of it to them, to be paid for at a future day? M. Hunt & Co. were themselves the charterers of the schooner, procured the captain as well as the vessel for the voyage, "shipped by M. Hunt & Co." says the bill of lading, and the defendant as master, received the cargo as theirs and signed the bill of lading of it as such, and that made him their agent and carrier, and which made him responsible alone to them for the conveyance and delivery of it to their order and to the destination designated in it. The plaintiffs were, therefore, no parties to the bill of lading or the contract of shipment, and had no control or authority over the captain or the cargo in his custody and possession as the carrier of it, and had no

right of action against him in any case, or in any event, on account of it. And so obvious was the fact that they had no right or property in it, that if they had applied to any insurance company to insure the cargo in their own name and disclosed these facts, they could not have effected an insurance upon it.

There was no such usage or custom as had been alleged and contended for on the other side, that the National Exchange Bank of Baltimore ought not to have suffered Montgomery Hunt to detach the bill of lading from the draft of the plaintiffs, when he accepted it on its presentation to his firm, prevailing, or generally recognized and established in the city of Baltimore, or in the State of Maryland, or indeed, any where else in the country at that time. For the evidence of the plaintiffs had utterly failed to prove that any such common or general usage existed there, or elsewhere in the country, either then, or now. And not until it has been clearly shown to the satisfaction of the court, that such a general usage has been established, as would import whenever a bill of lading is attached or pinned to a draft payable after sight, an instruction to all concerned in them that they are not to be severed or detached from each other until the maturity and payment of the draft, it cannot be considered or held by the court that any contract for the sale of goods so to be paid for was made with reference to it, or that it became by the usage and course of trade and the implied understanding and assent of the parties to it, a part of the contract. For the existence, as well as the legal effect of such a commercial usage in any such case is, after all, a question for the court, and not for the jury to decide.

*T F. Bayard*, for the plaintiffs. The first objection taken on the other side which he should notice was that the demand proved was not sufficient, the evidence in regard to which was that a positive and direct demand, both verbal and written, was made by the plaintiffs upon the defendant for the delivery of the corn to them, to which

he responded, by an unqualified and peremptory refusal without either demanding the freight, or stating the amount of it, which he was bound to do, if he intended to retain the possession of it for that reason, or to set it up as a matter of defense or justification in the present action. But his first and last and only reply to both demands uniformly was, that he would not give up the corn until he was compelled by law to do so. A conditional contract for the sale of goods was not void by law in the State of Pennsylvania unless it was tainted with fraud, actual or constructive; but in either case, the question of fraud is a question of fact to be decided by the jury under the instructions of the court as to the rules of law in regard to it. But in this case, was the delivery of the cargo, or of the bill of lading as the symbol of it, absolute or conditional? It was conditional. The understanding and agreement between the plaintiffs and the firm of M. Hunt & Co. was, as had been distinctly proved, that the cargo of corn was to be paid for in cash on the delivery of it to the latter on board the vessel in Philadelphia, and it would be remembered by both the court and jury that it had been as distinctly proved that it was afterward specially requested of the plaintiffs by Montgomery Hunt that as soon as loaded to the order of his firm and the bill of lading was so made out, they should draw upon his firm for the price of it, a draft at one day's sight with the bill of lading attached, and which in a few days thereafter was done in accordance with his request. But although it was so done, it did not involve, in the apprehension of either of the parties to it, the slightest deviation or departure from the strict terms of their original agreement and understanding that it was to be paid for in cash on the delivery of it as before stated; because it had also been as clearly and distinctly proved in the progress of the trial, that a payment by draft at one day's sight, is invariably considered in all commercial circles as equivalent to a payment in cash on delivery of the articles sold. It, therefore, remained according to the true intent and understanding of the parties to the con-

tract of sale, a substantial part and condition of it that the corn was to be paid for on the delivery of it, and before the purchasers had parted with the possession of it and had sold and transferred their apparent right and property in it to another, or by an immediate indorsement and negotiation, or transfer of the bill of lading to an entire stranger to their contract and understanding for a valuable consideration, and without any notice of it, to absolutely divest the plaintiffs of any right, title or property whatever in it, and without ever paying them a solitary cent for it. Such an act was not only a gross and manifest breach of the terms of the contract and the condition of sale, but if it was done as there was every reason for believing, by that firm in full view and expectation of its speedy failure, and with the secret knowledge and conviction that it was even then utterly and hopelessly bankrupt, it was even more than that, and far worse, for it was in that case, a flagrant and flagitious fraud, if not a crime, to obtain the possession of the property under such circumstances and with such a base and fraudulent intention. And such a breach of the condition of the contract of sale would wholly avoid it on their part, and could give them no legal right, title, or property in the cargo, although delivered to them under it. *Story on Sales*, 313. *Black on Sales*, 151. 4 *Wash.* 494. 2 *Smith's Ld. Ca.* 1095. *Add. on Contr.* 262. *Abb. on Ship.* 327, 328. *Brandt v. Bowlby*, 2 *Barn. & Ad.* 932. And a delivery of the goods sold under such circumstances, will not be allowed to defeat the real intention of the vendor, and the understanding of both the vendor and vendee, when so delivered. *Saltus v. Everett*, 20 *Wend.* 274.

After reviewing the evidence at large, he asked the court to charge the jury that if the firm of M. Hunt & Co. obtained possession of the bill of lading contrary to the terms of the contract and the intention of the plaintiffs, it was a fraudulent transaction on their part and vested no right of property in them in the cargo which it represented, and, therefore, their indorsement and delivery

77

of it to the firm of Thomas D. Quincey & Co. transferred no property in it to the latter, unless they took it in entire good faith, and without any notice or knowledge of the manner in which M. Hunt & Co. had obtained the possession of it, and also without any good ground or reason to surmise or suspect that they had obtained the possession of it contrary to the intention of the plaintiffs and their contract of sale with that firm for the cargo of corn in question, and that it was incumbent in law upon them, as the indorsees of it, to prove to the satisfaction of the jury that they so received it, or the verdict should be for the plaintiffs.

*Gilpin, C. J., charged the Jury.* This is, as you are aware, an action of replevin, in which, under the pleadings, is involved the question of the ownership of the property which is the subject of controversy. In order to entitle the plaintiffs to a verdict in their favor, they must show that at the time the property was taken under the writ of replevin it belonged to them. If they have failed to establish their ownership of the property at that time, or if it appears that the property then belonged either to M. Hunt & Co. or to Thomas D. Quincey & Co., your verdict should be in favor of the defendant. The controversy between the parties is not, it would seem, so much in regard to the real facts of the case, as it is in respect to the conclusions of law arising, or to be deduced from these facts. And, this being the case, I propose to state to you such of the material facts as are not disputed, in order that you may the more readily understand what I shall have to say upon the questions of law which have been presented by counsel on both sides, and upon which they have requested the court to instruct you.

It appears from the evidence that the firm of M. Hunt & Co. of Baltimore, had at different times since the year 1863, purchased from H. H. Mears & Son of Philadelphia, the plaintiffs in this action, sundry cargoes of grain amounting in the aggregate in value, to the sum of one hundred

and fifty or two hundred thousand dollars; so that it is
thus made manifest to you that their business transac-
tions with each other, extending through a period of
about three years, were of considerable magnitude. It al-
so appears from the testimony of Montgomery Hunt that
H. H. Mears & Son were in the habit of drawing, from
time to time, on M. Hunt & Co. for the value of these
several purchases, at one and three days' sight. And
some time in the latter part of February 1867, M. Hunt
& Co. applied to H. H. Mears & Son personally, and also
by letters, to purchase from them a cargo of ten or twelve
thousand bushels of corn, and the latter firm agreed to
sell and supply the same, and in pursuance of such agree-
ment they afterward delivered on board of the schooner
Paugusset, then lying in the port of Philadelphia, of
which the defendant was master, eleven thousand four
hundred and fifty one $\frac{32}{56}$ bushels of corn "per account
of M. Hunt & Co." On the 1st. of March M. Hunt & Co.
wrote to H. H. Mears & Son saying, "You will have her
[meaning the schooner Paugusset] loaded by Monday if
weather continues good. The bill of lading make same
as Waples' to order—will name point by telegraph to-
morrow—draw when loaded at one day's sight, bill of lad-
ing attached—try and get exchange as light as possible."
They wrote again to H. H. Mears & Son on the fourth
of the same month saying "The Schooner Paugusset
will sail for Boston and report to No. 40, Commerce
Street." On the sixth of the same month, March 1867,
H. H. Mears & Son caused to be prepared three bills of
lading in the names of M. Hunt & Co., as shippers of
the corn, and had them duly executed by the defendant,
as Captain of the Schooner, and two of them were then
delivered by the Captain to H. H. Mears & Son. The
bills of lading were in fact made out by Mr. B. H. Tatum,
the clerk or cashier of H. H. Mears & Son, in their coun-
ting house in the names of M. Hunt & Co. according to
their request, and with the sanction and approval of H.
H. Mears & Son. The witness, Tatum, says he remem-

bers that M. Hunt & Co. on two previous occasions purchased cargoes of grain of H. H. Mears & Son. He recollects the purchase of a cargo in the preceding month of January, but cannot say who were named in the bill of lading as the shippers; the proof, however, shows that M. Hunt & Co. were named in the bills of landing as the shippers of this cargo. He states that the cargo of the sixth of March was sold for cash, but that H. H. Mears & Son drew at one day's sight at the request of M. Hunt & Co. as contained in their letter of the first of March 1867. The bill of lading offered in evidence is in the following form:—Shipped in good order and condition by M. Hunt & Co. in and upon the Schooner called the Paugusset whereof Joseph Waples is master for the present voyage, now lying in the port of Philadelphia and bound to Boston, Mass., eleven thousand four hundred and fifty-one $\frac{32}{56}$ bushels corn to be delivered—being marked and numbered in the margin; to be delivered in like good order and condition at the aforesaid Port of Boston, Mass., (the dangers of the seas only excepted) unto order, or to assigns, he or they paying freight for the said goods at the rate of ten cents per bushel, weight, without primage and average accustomed. Witness, &c.

Dated Philadelphia 6th. of March 1867.

                                    JOSEPH WAPLES.

Indorsed on the back "To the order of Thomas D. Quincey & Co."

                                    M. HUNT & CO."

On the same day, March 6th. 1867, H. H. Mears & Son drew on M. Hunt & Co. at one day's sight for the sum of $11908.65, that being the value of the cargo including the exchange or discount on the draft, and indorsed the draft with the bill of lading attached, to the Philadelphia National Bank—the Bank taking the draft from them as cash, and placing the proceeds to their credit. The draft is as follows:

" $11,908\frac{65}{100}$.                    Philadelphia, March 6th. 1867.

One day after sight pay to the order of ourselves Eleven

thousand nine hundred and eight$\frac{65}{100}$ dollars, value received, which place to account of

H. H. MEARS & SON."

" To M. Hunt & Co. Baltimore."

It is indorsed on the back "H. H. Mears & Son." I may here remark that upon the transfer of the draft to the Philadelphia Bank by the indorsement of H. H. Mears & Son, it ceased to belong to them and became the property of the bank. The Philadelphia Bank immediately indorsed and remitted the same with the bill of lading attached, to the National Union Bank of Baltimore for acceptance and collection. On the next day, March the 7th, the draft with the bill of lading attached to it by a pin, was presented by Mr. Monnier, the collection clerk of the National Union Bank of Baltimore, to Montgomery Hunt, of the firm of M. Hunt & Co. for acceptance, who upon accepting the same in the name of his firm, detached the bill of lading, and retained it in his possession, without objection on the part of the bank clerk. Mr. Monnier, however, says that he had objected on a previous occasion, namely, on the occasion of presenting the draft for $10,000 in the month of January preceding, for acceptance, but that Mr. Hunt said they had always detached and kept the bill of lading on accepting the draft; and so he kept it. But Mr. Monnier says expressly that he did not object to Mr. Hunt's detaching the bill of lading which accompanied the draft of the 6th of March. He says that he had not then received any instructions from the bank on the subject, but that some six months afterward he received instructions not to allow bills of lading to be detached until the drafts had been paid. Messrs. Hursteine and Levering, both dealers in grain in Philadelphia, say that a bill of lading attached to a draft, is pledged as security for the payment of the draft, and that an acceptor has no right to detach it until he has paid the draft. Mr. Torry, the Vice President of the Corn Exchange Bank of Philadelphia, says the "usage" is to hold the bill of lading until the draft is paid, or until satisfactory arrangements are made with

the bank for its payment. That sometimes the bank permits acceptors to detach the bill of lading before payment of the draft, but in the absence of instructions he should not consider himself as having any authority or right to allow it to be detached, or delivered up to the acceptor; and that if he should do so, it would be at the risk and responsibility of the bank, and that if the bank had discounted the draft, or were the holders of it for value, they would, as owners of the draft, be entitled to hold the bill of lading attached to it, as security for its payment; or they might on acceptance permit the acceptor to detach and retain the bill of lading, but that if the bank did so, it would be at its own proper risk, so far as the interests of the drawer were concerned. Such it appears, Mr. Torry understands the " usage " to be, and such the responsibility of the bank, as resulting from that usage. James Barret, however, who has been engaged in the grain business for twenty-one or two years, does not know of any established usage in the trade to retain or detain the bill of lading until the draft has been paid. He understands the object of attaching the bill of lading to the draft to be to show the acceptor that the produce or goods has or have been shipped—" that the stuff has gone forward "—and has been consigned to the acceptor, so that he may know that he may with safety accept the draft. Montgomery Hunt states that in his business the bills of lading have always been delivered up to him on his acceptance of the accompanying drafts, and that no objection was ever made to his detaching and retaining them.

On the 7th of March, M. Hunt & Co. drew on Thomas D. Quincey & Co. of Boston at sight, for the sum of $10,350, in favor of the Bank of Commerce in Baltimore, and delivered the draft to the said bank with the bill of lading attached, indorsed on the back thereof " to the order of Thomas D. Quincey & Co." The Bank of Commerce immediately remitted the same to the National Exchange Bank of Boston for collection, which draft upon being presented, on the ninth of March 1867, to Thomas

D. Quincey & Co. was paid by them, and the same with the bill of lading was delivered up to them. On the 11th of March 1867, the draft drawn by H. H. Mears & Son on M. Hunt & Co. was duly protested for non-payment, and returned to the Philadelphia Bank, and has not since been paid by M. Hunt & Co. And on the 12th of March 1867, M. Hunt & Co. made an assignment of all their property for the benefit of their creditors. I have thus, I think, with substantial accuracy, stated the most material facts of this case. If, upon reviewing the evidence, you find I have misstated any fact, I beg of you to correct it; or if, on the other hand, I have omitted any material fact, I hope your better recollection will supply it. You are not to be governed by my statement, but by the evidence before you and as you remember the evidence to be. You will consider these and all subsidiary or surrounding facts or circumstances, and indeed, every thing disclosed by the testimony which may throw light upon the subject of your deliberations.

Now, gentlemen, if I understand the argument of counsel, or the grounds upon which the plaintiffs claim the property in dispute, they are substantially these. They insist in the first place, that there never was any real or valid contract of purchase and sale of the corn in question, between M. Hunt & Co. and the plaintiffs. In other words, they say that M. Hunt & Co. never had any title to, or property in the corn, either legal or equitable, by reason of the fraud which they allege M. Hunt & Co. practiced upon the plaintiffs; and that as the former could not pass to another a greater or better title than they themselves had, they having no valid title, could not by any act of theirs, convey to or vest in Thomas D. Quincey & Co. a good title, although the latter firm may have been innocent purchasers of the corn for value. And, secondly, that if M. Hunt & Co. had any title to, or property in the corn by force of the alleged contract of sale, it was a tainted title by reason of fraud, and therefore a defeasible and revocable title at the option of the plaintiffs, unless

Thomas D. Quincey & Co. were innocent purchasers for
value. They also insist that if M. Hunt & Co. are shown
to be fraudulent purchasers, the burden of proof on this
point is shifted, and that under this aspect of the case,
it becomes incumbent upon Thomas D. Quincey & Co. to
show by affirmative proof that they are innocent pur-
chasers for value, that is to say, that they purchased for
value without knowledge or notice of fraud. They, there-
fore, contend generally and broadly that M. Hunt & Co.
were fraudulent purchasers, that they obtained possession
of the corn, and of the bill of lading by fraud, and that
Thomas D. Quincey & Co. purchased from M. Hunt & Co.
with knowledge or notice of the fraud, and must, there-
fore, be deemed and taken to be parties to it. On the
other hand, the counsel for the defendant contend first,
that there was no fraud on the part of M. Hunt & Co. in
making the purchase of the corn, nor in obtaining pos-
session of the bill of lading; that M. Hunt & Co. and the
plaintiffs were well known to each other ever since the
year 1863; that between that time and March 6th, 1867,
the plaintiffs had sold to them from $150,000 to $200,000
worth of grain, that previous cargoes had been purchased
on the same terms as to time and mode of payment, that
bills of lading for another, or other cargoes, had been made
out by the plaintiff in the names of M. Hunt & Co. as
shippers, and the bills of lading forwarded to them at-
tached to the drafts, and that they had always detached
the bill of lading upon accepting the draft, and in doing
so, they had not violated any established usage of trade,
but had only done what they had a perfect right to do,
as no such usage as that contended for existed in Balti-
more, nor in Philadelphia. And generally, they insist
that there is no evidence before you, showing any fraud-
ulent intention or conduct on the part of M Hunt & Co.
Secondly, they say, even assuming for the sake of the
argument, that M Hunt & Co. were guilty of fraud in
making the purchase of the corn, and in obtaining pos-
session of the bill of lading, and that theirs was a defeas-

ible and revocable title before the interests of innocent
third parties intervened, yet, that Thomas D. Quincey &
Co. being innocent purchasers for value, and taking the
bill of lading under the indorsement of M. Hunt & Co.
without notice or knowledge of the fraud, acquired a
valid and indefeasible title against the plaintiffs.

You thus perceive, gentlemen, that the first question for
you to inquire about and decide is, whether M. Hunt &
Co. were guilty of fraud in procuring the contract, or in
obtaining possession of the corn and the bill of lading.
And in case you shall be of opinion that it has been shown
that they were guilty of fraud in this regard, then in the
next place you will inquire and decide whether their fraud,
that is, fraud on the part of M. Hunt & Co, affects the ti-
tle of Thomas D. Quincey & Co. And in order to aid you
in arriving at just conclusions in regard to these questions,
it is our duty to state to you as concisely as we can, what
we understand to be the rules of law applicable to fraudu-
lent purchases, and when, and under what circumstances,
and to what extent, the rights of third parties may be af-
fected by fraud.

But before doing so, I take occasion to advert for a
moment, to the doctrine which has been urged in the
argument, in relation to what is called the usage of trade
in regard to detaching Bills of Lading from drafts, upon
acceptance of the latter. There can be no doubt that the
known and received usage of a particular trade, and the
established course of commercial dealings under it, are
tacitly annexed to the terms, and become part of a com-
mercial contract. As, for instance, although a draft is on
the face of it made payable at a future day certain, yet the
three additional days of grace, according to the known and
established custom of merchants, are understood to be
annexed to, and constitute a part of the contract. And
yet, even quite a number of Banks, or mercantile firms or
houses in a large commercial City, can not by their prac-
tice establish a commercial usage, so as to make it binding
as such, on the trading community generally. The estab-

78

lished custom or usage of a trade, is undoubtedly the law of that trade. But to make it binding, it must be certain, uniform, reasonable and general, and of long standing, or, at least, of such long standing as to have become so generally known, recognized and acted on by the trade, as to raise a fair presumption that the parties in entering into their engagements, did so with a silent reference to the usage, and a tacit agreement that their rights and responsibilities should be determined by it. It must be the usage of the trade generally, and not the practice of a portion merely of the trade, or of particular firms or houses or banking establishments; for such limited or partial practice will not be sufficient to establish a commercial usage in the sense in which these terms are understood in the law. Moreover, it does not follow that because a custom or usage is recognized as obligatory in Philadelphia or New York, that it is recognized as such in Baltimore or New Orleans, or has any force or effect in these latter cities. The custom or usage in one State, may not be the same in another. The States of the Union in regard to commercial purposes, stand in the relation of foreign states toward each other, so that a custom or usage in one State, is not necessarily binding or obligatory upon persons engaged in the same trade in another State. Now, it does not appear from any evidence in this case, that any such usage as that contended for by plaintiffs' counsel, has ever at any time existed in Baltimore, or in the State of Maryland. And in the absence of affirmative proof, you can not presume the existence of such a usage. Again, in the absence of proof of instructions by H. H. Mears & Son to the Philadelphia Bank, and from the latter to the Baltimore Bank, not to allow the bill of lading to be detached from the draft before payment, you will not be justified in assuming that any instructions upon the subject had ever been given.

Having thus endeavored to explain to you, our views of the law in respect to what are called customs or useages of trade, I now pass to the consideration of the

question of fraud generally, and the rules of law applicable to the subject, which it is the duty of the court to state for your guidance in investigating the questions of fact submitted for your decision. And here allow me to say at the very outset, that good faith and fair dealing lie at the very foundation of all valid contracts, and that the law abhorring fraud of every nature and description as it does, will unkennel and expose it wherever it can be found, no matter how many, or what may be the character of the disguises which surround it. It may be laid down as a general rule, that all contracts incepted in fraud or tainted with fraud, are voidable contracts. Now actual or positive fraud may be said to be any false representation, deceit, device, or artifice used by one person with intent, or for the purpose of deceiving and misleading another to his injury. It assumes every shape and form, however. And, therefore, courts of justice have found it difficult to lay down any very exact rules in regard to its nature, or to give any very accurate definition of the term itself, or to prescribe any very definite rules as to the evidence necessary to establish the fact of fraud. And hence, they have refrained from attempting to do so from a prudent fear that they might thereby so limit their powers of investigation, as to afford opportunity to ingenious dishonesty successfully to evade the laws. I shall not, therefore, undertake to give you any precise definition of the term, but shall content myself by merely saying to you that the fact of fraud must be proved, either directly or inferentially as others facts are proved, by the circumstances attending or surrounding the particular transaction which is the subject of controversy. Fraud is never presumed to exist. On the contrary, it must be clearly established by the evidence. For where the circumstances attending the transaction are of a doubtful character merely, or raise but a bare suspicion of fraud in regard to the party charged therewith, they will not be sufficient evidence of the fact. The circumstances relied on must be of such a nature as to raise more than a mere

suspicion of fraud; they must be of such significance and force as clearly to establish the facts in the judgment of the jury. It is not necessary, however, that the proof should be direct and positive, it will be sufficient if the circumstances disclosed by the evidence, manifestly show that fraud has been practiced by the party.

A contract which has been incepted in fraud, is so vitiated by it that it may be rescinded and avoided, or not, at the option of the injured party. And if it be a contract of sale, the seller may reclaim the goods, provided the rights of a third party as a *bona fide* purchaser of them have not intervened. But the right of the seller to rescind or avoid the contract, and reclaim the goods from the buyer on the ground of fraud, exists only so long as the goods are in the hands of the fraudulent purchaser, or of some one who has taken them of such fraudulent purchaser with knowledge of the fraud by which they were originally obtained. I have already said that in case of fraud on the part of the buyer, the seller may avoid the contract before the interests of third parties, in good faith and for value, become involved in the transaction. Until then, it is at the seller's option to avoid, or affirm the contract. But until the contract is rescinded or avoided, the title or property in the goods is in the buyer, and he may sell or dispose of them to a *bona fide* purchaser for value, and thus vest in him a good, indefeasible, and irrevocable title to the property. It, therefore, follows both justly and logically, that a purchaser for a valuable consideration without knowledge or notice of fraud, takes a valid title from the fraudulent buyer which can not be defeated by the original vendor. And a consignee of goods who in good faith makes advances upon them, stand precisely in the same position as a purchaser for value, as against the original vendor, and the same principles of law in this regard, apply to his case. And permit me to say that this doctrine of the law is most reasonable and just, because the owner having voluntarily parted with his goods and clothed the buyer with a title which is

good until the seller avoids it, which he may do, or not, as he pleases, it is through his own act that the buyer from him is enabled to re-sell the goods; and, therefore, a *bona fide* purchaser of them without knowledge of the circumstances ought not to be made to suffer. After delivery of the goods in pursuance of a sale, the seller can not rescind the contract, or reclaim the goods on the ground of fraud without proving deceptive assertions, or false representations, in some form or other, fraudulently made to induce him to part with his property. Mere insolvency of the buyer, though well known to himself and concealed from the seller, does not in itself furnish sufficient grounds for rescinding a contract of sale. Nor will the fraudulent purchasing and obtaining of goods with an intention of never paying for them of itself render the contract of sale absolutely void, even as between the seller and buyer; yet, it will render it voidable at the election of the seller, but if the goods are sold by such fraudulent buyer to an inno-cent third party for value, the latter will take and hold them by a valid title. And, therefore, it may be laid down as settled law, that although as between the original parties, a sale and delivery of goods obtained by fraud is voidable, and may be rescinded at the option of the seller, and the goods reclaimed from the fraudulent purchaser, yet, as heretofore intimated, if the goods have passed into the hands of a *bona fide* purchaser for value, without knowledge or notice of the fraud, such purchaser will take a title which can not be revoked or impeached by the defrauded seller.

A bill of lading by the custom of merchants and according to the principles of the common law, is held to be, in a certain sense, a negotiable instrument, that is, an instrument transferable by indorsement. And, indeed, it is well settled in the law that the indorsee of a bill of lading who holds it for value, or who has in good faith made advances on the receipt of it, has as good and effectual a title to the goods which it represents, as he could have obtained by the actual manual delivery to him of the goods themselves.

In other words, the indorsement and delivery of a bill of lading is equivalent to a delivery of the goods; so that, according to the principles of commercial law, the indorsement of a bill of lading for a valuable consideration without notice of fraud, or of any adverse interest, vests in the indorsee an indefeasible title and makes him the absolute owner of the goods against all the world. No amount of fraud on the part of the person who indorsed the bill of lading, can, in the least, affect the title of the indorsee to the goods, for the plain reason that his title is that of an honest purchaser without knowledge or notice of any defect in the seller's title, or any sufficient reason to believe or suspect that fraud has been committed in the original purchase. Nor will the rights of such *bona fide* endorsee be altered or prejudiced by the fact that the person from whom he purchased, had effected the contract with the first seller, or obtained possession of the goods by means of false and fraudulent representations. As regards sales for cash and sales on condition, and the questions of law in respect to such sales which have been raised and argued by counsel, it is only necessary for us to say to you, in the language of Judge Bartoll that a " *bona fide* purchaser without notice of the condition upon which his vendor had acquired possession of the goods, will be protected against the claim of the original vendor in the same manner where the sale and delivery are conditional, as where the possession has been obtained by fraud."

And now, gentlemen, I beg to recall your attention closely to the consideration of all the facts of this case. The question to be determined by you is whether such fraud has been established by the evidence; as will affect the title of Thomas D. Quincey & Co. to the corn in dispute. And in regard to this question we again say to you that fraud can not be presumed, but must always be proved as any other fact. Now, if the plaintiffs shipped or placed the cargo of corn on board of the Schooner Paugusset in pursuance of a contract of sale, and for account of M. Hunt & Co. and knowingly took from Captain

Waples bills of lading in the names of M. Hunt & Co., as shippers and owners thereof, containing an engagement on the part of the captain to deliver the corn at the Port of Boston, " to order " or " assigns," and drew on the said M. Hunt & Co. at one day's sight, for the price or value of the cargo, then we say to you that these acts on the part of the plaintiffs, amounted to a delivery of the corn to M. Hunt & Co. and vested in them a title to the same, and thus enabled them to pass or transfer the property in the corn to a *bona fide* purchaser.

But say the counsel for the plaintiffs, M. Hunt & Co. procured the contract of sale to be made and the corn to be delivered on board the Paugusset, and induced the plaintiff to have the bills of landing made out in the names of M. Hunt & Co. as shippers, and also induced the plaintiffs to give credit on the sale by drawing at one day's sight by artifice and false and fraudulent pretences and representations. Well, assuming for the moment and for the sake of the argument, that in these respects the conduct of M. Hunt & Co. was fraudulent. What then ? Why simply this : the contract of sale, as between the plaintiff and M. Hunt & Co. would be revocable at any time before the title to, and property in, the corn passed to a *bona fide* purchaser, a purchaser for value, without knowledge or notice of the fraud. But until the contract was revoked or rescinded, M. Hunt & Co. could make a valid sale and transfer of the goods to an honest purchaser for value. But again, were M. Hunt & Co. in fact, guilty of fraud? This is a question to be determined by the jury in view of all the evidence before them. If M. Hunt & Co. were not guilty of fraud, then there is an end to the plaintiffs' case, and you need not inquire further. But assuming for the moment, that M. Hunt & Co. were guilty of fraud as alleged by the plaintiffs, then it will remain for you to consider and determine the further question, whether, according to the evidence before you, Thos. D. Quincey & Co. on the 9th of March 1867, at the time when they received the bill of lading and paid the draft of M. Hunt & Co. for $10,350.00, had knowledge or

notice of any fraud committed by the latter. And we now distinctly say to you that no matter what may have been the fraudulent conduct of M. Hunt & Co. in relation to the purchase of the corn, or in obtaining possession of the bill of lading, if Thomas D. Quincey & Co. had no knowledge or notice of the fraud at the time when they received the bill of lading and paid the draft, their title to the corn can not be impeached, because Thomas D. Quincey & Co. having themselves violated no rule or principle of sound morals or of commercial honesty, and having advanced their money on the faith and credit of a bill of lading which could by no possibility have intimated to them that H. H. Mears & Son were or could be interested in the cargo, they ought not to suffer on account of M. Hunt & Co.'s misconduct; and we, therefore, say to you, if you find such to be the state of the case, that the title of Thomas D. Quincey & Co. was and is, a good and indefeasible title, and your verdict should be in favor of the defendant. And this is so, according to the well settled rule of law that if the title to goods has been passed by indorsement and transfer of a bill of lading to a purchaser for value without knowledge or notice of fraud, such purchaser takes and holds a good title to the property against all the world : a rule of law, allow me to say, which is founded upon the just and equitable principle recognized in all courts of justice whether of law or equity, that where one of two innocent persons must suffer by the fraud of a third, the loss shall fall upon him who has enabled such third person to do the wrong. If, however, you shall be of opinion from the evidence that M. Hunt & Co. were guilty of fraud, and that Thomas D. Quincey & Co., on the 9th of March, at the time when they received the bill of lading and paid the draft, had knowledge or notice of the fraud, then your verdict should be in favor of the plaintiffs. The burden of showing that Thomas D. Quincey & Co. knew of the fraud, rests on the plaintiffs. If your verdict shall be in favor of the defendant, then, as the corn cannot be returned, it is necessary for you to ascertain the amount of his damages.

The Chief Justice then stated the rule in regard to the measure of damages, and left the case with the Jury.

Verdict for the defendant for the amount claimed.